Glenn S. Kerner (GK2482)
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 813-8800
Fax: (212) 355-3333
gkerner@goodwinprocter.com

*Of Counsel*

Douglas J. Kline
Shirley Sperling Paley
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109
Telephone: (617) 570-1000
Fax: (617) 523-1231
dkline@goodwinprocter.com
spaley@goodwinprocter.com

*Attorneys for Plaintiff*
*Beth R. Jacobson (formerly Beth R. Wolmer)*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| BETH R. JACOBSON<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CELGENE CORPORATION,<br><br>　　　　Defendant. | Civil Action No. _____<br><br>**VERIFIED COMPLAINT AND JURY DEMAND** |

　　　　1.　　　　Plaintiff Beth R. Jacobson brings this action for misappropriation of an idea and unjust enrichment against Defendant Celgene Corporation ("Celgene") based on Celgene's misappropriation of Ms. Jacobson's novel idea for treating multiple myeloma with thalidomide. As Celgene itself acknowledged in its 2001 Annual Report, when Ms. Jacobson's late-husband,

Dr. Ira Wolmer, was suffering from multiple myeloma, she "worked tirelessly to find new therapies for" his treatment. Ms. Jacobson's "research led her to request that he be treated with THALOMID [Celgene's brand name for thalidomide]. This was an important first step in identifying THALOMID's potential as a multiple myeloma therapy."

2.  As a direct and proximate result of Ms. Jacobson's efforts, and the confidential disclosure to Celgene of her new and innovative idea that thalidomide could be an effective treatment against multiple myeloma, Celgene today is a $24 billion company which last year reported $2.3 billion in revenue. In 2008 alone, Celgene reported that over 80 percent of that revenue was based on Celgene's sale of THALOMID and REVLIMID (a thalidomide analog) for the treatment of multiple myeloma. Before Ms. Jacobson imparted her idea to Celgene, it reported annual revenue in 1997 of only $1 million, with less than one year's worth of cash on hand. Indeed, it appears that Celgene may not exist today were it not for Ms. Jacobson's efforts. Yet, Ms. Jacobson has never received any compensation for the unique and valuable contribution she made to the company.

### Parties

3.  Plaintiff Beth Jacobson is an individual residing in New York State.

4.  Defendant Celgene Corporation is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 88 Morris Avenue, Summit, New Jersey 07901.

### Jurisdiction and Venue

5.  Jurisdiction is proper under 28 U.S.C. 1332(a)(1) because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000 exclusive of costs and interest.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Defendant Celgene resides within this District.

## Background Facts

*Ms. Jacobson's Husband's Disease*

7. In March 1995, Plaintiff Beth Jacobson's late husband, Dr. Ira Wolmer, who was then 35 years old, was diagnosed with multiple myeloma; an incurable blood cancer that develops in the bone marrow. In 1995, patients diagnosed with multiple myeloma had a median survival rate of approximately three years. Today, due in significant respect to Ms. Jacobson's efforts and her discovery that thalidomide could be a highly effective agent against the disease, the median survival rate is approximately five years, with about 20% of multiple myeloma patients living for more than ten years.

8. Multiple myeloma is the second most common blood cancer after non-Hodgkin's lymphoma, and represents approximately 1% of all cancers. In multiple myeloma, normal antibody producing plasma cells present in the bone marrow become transformed into malignant myeloma cells. As a result of the transformation, the myeloma cells produce large quantities of one antibody, which is referred to as a monoclonal protein. The malignant cells also multiply leaving less space for normal blood cells (i.e., crowd out the normal blood cells) and inhibit the production of normal blood cells and antibodies in the bone marrow. In addition, certain myeloma cells cause other cells in the bone marrow to remove the solid part of the bone and cause osteolytic bone lesions, or soft spots in the bone. In addition to causing osteolytic lesions, multiple myeloma also results in anemia, renal damage, impaired production of normal antibodies, increased susceptibility to bacterial infection, and hypercalcemia. Multiple myeloma often is also characterized by diffuse osteoporosis, usually in the pelvis, spine, ribs, and skull.

9.      When Dr. Wolmer was diagnosed with multiple myeloma, Ms. Jacobson and her husband set out to fight the disease. At the time, although physicians were treating multiple myeloma with chemotherapy and bone marrow transplants, most patients with the disease never experienced any meaningful remission. Ms. Jacobson, putting her career at a law firm on hold, devoted substantially all her efforts to identify treatment options for her husband. After thoroughly researching different treatment centers, Ms. Jacobson and Dr. Wolmer decided that Dr. Wolmer should be treated at the Myeloma Institute for Research and Therapy at the University of Arkansas for Medical Sciences in Little Rock, Arkansas (the "Myeloma Institute"), one of the nation's preeminent centers for the treatment of multiple myeloma.

10.     Dr. Wolmer's treatment at the Myeloma Institute began in April 1995. He was treated there by a team of doctors, led by Dr. Bart Barlogie and including Drs. Anaisse, Dr. Desiken, Dr. Jagganath, Dr. Mehta, Dr. Siegel, and Dr. Singhal. Dr. Barlogie, an oncologist specializing in the treatment of multiple myeloma, founded the Myeloma Institute in 1989. The other doctors comprised a team of oncologists who treated patients at the Myeloma Institute.

11.     Ms. Jacobson was at her husband's side throughout his battle with multiple myeloma. Ms. Jacobson devoted near constant and substantial effort to researching potential new and experimental treatments for her husband's disease because she knew that none of the current treatment options would keep her husband alive for very long. Her research was difficult and time-consuming as it occurred before the widespread use of the Internet. Ms. Jacobson spent hours in the hospital with her husband reading articles about cancer therapies in oncology journals at the Myeloma Institute. She shared her research and thoughts about the articles with her husband, himself a cardiologist. Often, she asked Dr. Wolmer to explain medical terms to her. When Ms. Jacobson found an article that piqued her interest, she called the researchers who

wrote the article to speak with them in more detail regarding their research. Ms. Jacobson also kept in constant touch with the oncologists at the Myeloma Institute to learn whether they heard of any new or experimental treatments at conferences or meetings they attended. Again, whenever Ms. Jacobson learned of any treatment or drug that she thought might have even the slightest potential for treating her husband, she followed up directly with the researchers for more information as there were no current promising trials for new multiple myeloma treatments at that time. Ms. Jacobson occupied herself with this type of research for approximately fifty hours per week.

12.     Between October 1995 and October 1997, Dr. Wolmer underwent three bone marrow transplants. Before undergoing each transplant procedure, Dr. Wolmer received a heavy dose of extremely toxic chemotherapy to remove all of the cancer cells from his body. During this period of time, he was highly susceptible to infections and had to be isolated. In July 1997, he received an experimental dendritic based vaccination in an attempt to treat the multiple myeloma disease. After each of these treatments, Dr. Wolmer experienced a brief remission. Inevitably, however, the cancer returned. None of the treatments, both experimental and conventional, worked to put Dr. Wolmer into remission for any significant length of time.

13.     Each time her husband entered a period of short remission, Ms. Jacobson continued her research for new treatments in anticipation of another relapse. Again, she sifted through oncology periodicals, using her husband's knowledge of medicine and quizzing the physicians at the Myeloma Institute. In pursuit of a new treatment, Ms. Jacobson read countless articles in medical journals and contacted dozens of physicians and researchers throughout the world to investigate potential new treatments.

*Ms. Jacobson's Novel Idea to Use Thalidomide to Treat Multiple Myeloma*

14.     In November 1997, Ms. Jacobson contacted Dr. P. Leif Bergsagel by telephone after reading about him in a medical journal. At the time, Dr. Bergsagel was a physician at the Myeloma Center affiliated with the Weill Cornell Medical College in New York City. Dr. Bergsagel was not able to offer any new treatment options for multiple myeloma. However, at the end of her discussion with Dr. Bergsagel, Ms. Jacobson asked Dr. Bergsagel whether there was anything else he could think of or anyone else she could contact to discuss treatments for her husband's disease. He, in turn, suggested Dr. Judah Folkman at Children's Hospital Boston, in Boston, Massachusetts. Dr. Bergsagel told Ms. Jacobson that he recently had heard Dr. Folkman speak at a medical conference in Europe. He said Dr. Folkman was conducting interesting research in the field of childhood leukemia.

15.     Ms. Jacobson researched Dr. Folkman and learned that he was working on treating childhood leukemia, and became familiar with his theory that certain cancers may be treated by using drugs that stop angiogenesis (new blood vessel formation).

16.     Ms. Jacobson, at that point, decided to contact Dr. Folkman because she reasoned that a drug useful in treating leukemia (a proliferation of leukocytes - a certain group of white blood cells) may also be useful in treating multiple myeloma (a proliferation of plasma cells - another group of white blood cells).

17.     Following her discussion with Dr. Bergsagel and her research into Dr. Folkman's work, Ms. Jacobson telephoned Dr. Folkman and left him a number of telephone messages over a period of approximately two weeks. Finally, at the end of November 1997, Dr. Folkman returned Ms. Jacobson's telephone calls on a Saturday evening. During the call, Dr. Folkman discussed his research on angiogenesis and his developing idea of using thalidomide to

treat childhood leukemia. Ms. Jacobson suggested the idea of using thalidomide to treat her husband's multiple myeloma because of the similarities she perceived between leukemia and multiple myeloma. Dr. Folkman told her that he had never thought of the idea. At first, Dr. Folkman told Ms. Jacobson that he did not think the drug would work for multiple myeloma, but after listening to Ms. Jacobson, Dr. Folkman agreed that she had no other options and that treating her husband with thalidomide as a last resort would be of no harm. Ms. Jacobson asked Dr. Folkman where she could obtain thalidomide, and Dr. Folkman pointed her to defendant, Celgene.

18. Promptly after her conversation with Dr. Folkman, Ms. Jacobson spoke with Dr. Barlogie and insisted that her husband be treated with thalidomide. Dr. Barlogie was extremely reluctant and skeptical because such a treatment had never been tried or tested before. On information and belief, none of the other physicians at the Myeloma Institute believed thalidomide could work in treating multiple myeloma and all of them treated Ms. Jacobson's idea with skepticism.

19. Despite the widespread skepticism surrounding her idea to treat Dr. Wolmer with thalidomide, Ms. Jacobson persevered and convinced Dr. Barlogie and others at the Myeloma Institute to pursue thalidomide as a last resort for a patient they believed was sure to succumb to multiple myeloma in a short time.

20. Ms. Jacobson confidentially contacted Celgene to begin the process of obtaining thalidomide for her husband. Dr. Barlogie then continued the communications with Celgene on Ms. Jacobson's behalf on a confidential basis. Ms. Jacobson and her husband were determined to fight the disease and they made efforts to keep communications regarding his medical condition and the treatment he was receiving confidential.

21. At the time, Ms. Jacobson believed that thalidomide could be a breakthrough treatment for multiple myeloma. If this turned out to be the case, it could not only help her husband but also tens of thousands of others suffering from this deadly disease. She also understood that finding a treatment for multiple myeloma would be a great commercial success from which she too could profit. By that point, Ms. Jacobson and her late husband had expended a great deal of their savings and income in fighting Dr. Wolmer's multiple myeloma and financial wellbeing was of great concern to her, especially because she and Dr. Wolmer had a young daughter. Ms. Jacobson and Dr. Wolmer discussed the potential profits from the discovery of thalidomide as a treatment for multiple myeloma many times as they continued to fight the disease.

22. On December 5, 1997, Dr. Barlogie wrote to the FDA to seek approval to administer thalidomide to Dr. Wolmer on an experimental basis. Later that month, the FDA granted approval to treat Dr. Wolmer with thalidomide.

23. From December 1997 to March 1998, Dr. Wolmer was treated with thalidomide. Unfortunately, Dr. Wolmer died on March 10, 1998.

24. While Dr. Wolmer was undergoing his treatment with thalidomide, a fellow patient at the Myeloma Institute asked Ms. Jacobson about the drug her husband was receiving. Ms. Jacobson told him about her research. After speaking with Ms. Jacobson, this patient also requested treatment with thalidomide as a last resort. The physicians at the Myeloma Institute used thalidomide to treat this patient. This time, thalidomide worked and the patient had a near complete remission.

*Celgene's Use of Ms. Jacobson's Idea*

25. Following Dr. Barlogie's successful use of thalidomide in a multiple myeloma patient, Dr. Barlogie and others, including Dr. Jerome Zeldis, a Celgene employee, conducted a clinical trial, the results of which were published in the New England Journal of Medicine. 341 N.E. J. Med. 1565 (1999), a copy of which is attached as Ex. A. The article concluded that "thalidomide had substantial antitumor activity in patients with advanced myeloma," 341 N.E. J. Med. at 1569. The article was dedicated to the memory of Dr. Wolmer and expressly acknowledged Ms. Jacobson's idea of using thalidomide to treat multiple myeloma and stated: "We are indebted to Beth Wolmer for her persistence in recommending the clinical evaluation of thalidomide in the treatment of multiple myeloma." 314 N.E. J. Med. at 1571.

26. Celgene's 1999 Annual Report stated that the 1999 clinical trial for the treatment of multiple myeloma with thalidomide along with its publication in the New England Journal of Medicine was a "seminal event in the commercialization of THALOMID." The Report went on to state Celgene's "intention" to submit a New Drug Application (NDA) to the FDA based on the data from this study.

27. Up to the time Ms. Jacobson herself contacted Celgene and directed Dr. Barlogie to contact Celgene to obtain thalidomide for treating multiple myeloma, neither Celgene nor any other entity was developing the drug in connection with this disease. Celgene's public filings up to that time never mentioned the treatment of multiple myeloma. Indeed, Celgene was developing thalidomide for the treatment of lesions associated with leprosy. Following Dr. Barlogie's study, Celgene began to work to commercialize thalidomide for the treatment of multiple myeloma.

28.     Celgene received FDA approval to market thalidomide in combination with dexamethasone (at the time a standard drug administered to multiple myeloma patients) for the treatment of patients with "newly diagnosed multiple myeloma" on or about May 26, 2006.

***Ms. Jacobson's Relationship with Celgene***

29.     After grieving from the loss of her husband, Ms. Jacobson contacted Celgene's then-CEO, John Jackson, in the Fall of 2000. The two spoke by phone a number of times and then met in person for lunch in New York City on October 25, 2000. At the meeting, Mr. Jackson expressed his gratitude to Ms. Jacobson for initiating the use of thalidomide for treating multiple myeloma. The drug was not only an enormous breakthrough for his company, but it also helped keep his relative, who was suffering from multiple myeloma, alive. Mr. Jackson also told Ms. Jacobson that Celgene wanted to further develop and maintain a working relationship with Ms. Jacobson given her great contribution to the company. Ms. Jacobson reasonably understood from these discussions that Celgene expected to compensate her for the contribution that she had made to the company.

30.     On October 27, 2000, at an International Myeloma Foundation ("IMF") gala event sponsored by Celgene and attended by Mr. Jackson, Ms. Jacobson received the first ever IMF Courage Award for identifying thalidomide as an option for the treatment of multiple myeloma and for convincing Dr. Barlogie to try it on her late husband, Dr. Wolmer.

31.     The letter to the shareholders at the beginning of Celgene's 2001 Annual Report (attached as Ex. B), signed by Mr. Jackson, the company's then Chairman and CEO, and Dr. Sol Barer, the company's then President and Chief Operating Officer, honored and acknowledged Ms. Jacobson's work. The letter stated: "Beth worked tirelessly to find new therapies for her husband, who was dying of multiple myeloma. Her research led her to request

that he be treated with THALOMID. This was an important first step in identifying THALOMID's potential as a multiple myeloma therapy."

32.     Ms. Jacobson and Mr. Jackson continued to speak with one another about the possibility of Ms. Jacobson working with Celgene. Mr. Jackson approached Ms. Jacobson about becoming a member of Celgene's Board of Directors based on her discovery for the use of thalidomide to treat multiple myeloma and her experience as an attorney with a major U.S. law firm and as a general counsel of a public company. Mr. Jackson assured Ms. Jacobson that he would work for and support her nomination. Implicit in the discussions between Mr. Jackson and Ms. Jacobson was that Ms. Jacobson expected to be compensated for her contribution to Celgene.

33.     At Mr. Jackson's request, Ms. Jacobson, on October 31, 2005, submitted a letter to Mr. Jackson outlining her qualifications for and interest in a board seat on Celgene's Board of Directors. Mr. Jackson told Ms. Jacobson that he would show the letter to the right people on the Board of Directors and would support her nomination.

34.     On December 27, 2005, Celgene announced that Mr. Jackson would retire as CEO effective May 1, 2006, and that Dr. Sol Barer would replace him.

35.     Ms. Jacobson then telephoned Dr. Barer on a number of occasions. On or about March 8, 2007, Ms. Jacobson and Dr. Barer met in person over lunch in Summit, New Jersey. In furtherance of the conversation initiated with Mr. Jackson, Ms. Jacobson and Dr. Barer again discussed the possibility of Ms. Jacobson joining Celgene's Board of Directors. Dr. Barer assured Ms. Jacobson that he would continue Mr. Jackson's efforts in this regard. He requested that Ms. Jacobson again write a letter outlining her background, interest and qualifications for those members of the Celgene Board of Directors who did not know her well.

36. On July 23, 2007, Ms. Jacobson sent the requested letter to Dr. Barer. Upon receipt of her letter, Dr. Barer emailed Ms. Jacobson on July 24, 2007 stating "Thanks Beth – will pass on."

37. Over the next year and a half, Ms. Jacobson continued to follow up with Dr. Barer by telephone and by email to inquire about the status of the nomination process. Dr. Barer, however, canceled every planned telephone call and meeting with Ms. Jacobson at the last minute.

38. Finally, on February 3, 2009, Dr. Barer's assistant simply emailed Ms. Jacobson stating that Celgene was not interested in a telephone call or a meeting with her.

39. Before Celgene began to market thalidomide for the treatment of multiple myeloma, Celgene had annual revenue of approximately $1 million with less than one year's worth of cash on hand. On information and belief, in 2008, Celgene recorded annual revenue of $2.3 billion, of which over eighty percent were derived from the sale of THALOMID (thalidomide) and REVLIMID (a thalidomide analog) for the treatment of multiple myeloma.

## COUNT I

### MISAPPROPRIATION OF AN IDEA

40. Ms. Jacobson realleges and incorporates by references Paragraphs 1-39.

41. Ms. Jacobson's idea of treating multiple myeloma with thalidomide was novel. No one in the medical community was using the drug for this purpose before Ms. Jacobson's discovery.

42. In fact, Dr. Folkman said he had never thought of it before Ms. Jacobson contacted him. He did not know that it would work and only thought it was worth trying as a last resort. In addition, the physicians at the Myeloma Institute, including Dr. Barlogie, did not think

it would work. They only agreed to try it because Dr. Wolmer had no other treatment options available to him, and because Ms. Jacobson was tenacious in her struggle to help her husband.

43. Ms. Jacobson imparted her idea to defendant Celgene in confidence directly and then through private communications between Ms. Jacobson's agent, Dr. Barlogie, and Celgene.

44. Celgene adopted Ms. Jacobson's idea and has made use of it with its own activities, marketing the drug thalidomide for treating multiple myeloma. As described in Paragraph 39 above, the sale of thalidomide and thalidomide analog for the treatment of multiple myeloma has been the predominant factor in Celgene's success and profits.

45. Ms. Jacobson has sustained direct injury and actual damages as the direct and proximate result of Celgene's misappropriation of her idea.

## COUNT II

## UNJUST ENRICHMENT

46. Ms. Jacobson realleges and incorporates by references Paragraphs 1-45.

47. Celgene has received and continues to receive substantial benefit from Ms. Jacobson's groundbreaking and lucrative idea of treating patients suffering from multiple myeloma with thalidomide.

48. The retention of the benefit Celgene has received from Ms. Jacobson without compensating her is unjust.

49. Celgene has been unjustly enriched at Ms. Jacobson's expense.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Jacobson respectfully requests judgment as follows:

(a) That this Court declare that Celgene misappropriated Ms. Jacobson's novel idea;

  (b)  That this Court declare that Celgene has been unjustly enriched at Ms. Jacobson's expense;

  (c)  That this Court award Ms. Jacobson compensatory and restitution damages;

  (d)  That this Court order Celgene to provide to Ms. Jacobson an accounting of Celgene's profits;

  (e)  That this Court award Ms. Jacobson disgorgement of past profits that Celgene has obtained as a result of its misappropriation of Ms. Jacobson's novel ideal and/or its having been unjustly enriched at her expense, the precise amount to be awarded to Ms. Jacobson to be determined, but in no event less than $300,000,000 (three hundred million dollars);

  (f)  That this Court order Celgene to pay to Ms. Jacobson, on a prompt and regular basis, a percentage of Celgene's future profits resulting from its misappropriation of her novel idea and/or its having been unjustly enriched at her expense, such percentage to be determined, but in no event less that 25% of such future profits;

  (g)  That this Court award to Ms. Jacobson prejudgment and post-judgment interest, as appropriate;

  (h)  That this Court award to Ms. Jacobson her attorneys' fees, costs and expenses; and

  (i)  That this Court award to Ms. Jacobson such other relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all counts of her Complaint.

Dated August 24, 2009                                Respectfully submitted,

By: __s/ Glenn S. Kerner_____
    Glenn S. Kerner (GK2482)
    **GOODWIN PROCTER LLP**
    The New York Times Building
    620 Eighth Avenue
    New York, NY 10018-1405
    Telephone: (212) 813-8800
    Fax: (212) 355-3333
    gkerner@goodwinprocter.com

*Of Counsel*

Douglas J. Kline
Shirley Sperling Paley
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109
Telephone: (617) 570-1000
Fax: (617) 523-1231
dkline@goodwinprocter.com
spaley@goodwinprocter.com

*Attorneys for Plaintiff*
*Beth R. Jacobson (formerly Beth R. Wolmer)*

## VERIFICATION

I, Beth R. Jacobson, state that I have read the foregoing Verified Complaint, and that the allegations in the Verified Complaint are true, based on my personal knowledge, except where they are indicated to be based upon information and belief, and as to those allegations, I am informed and believe them to be true.

Subscribed and sworn to under the penalties of perjury this 24th day of August, 2009.

_____
Beth R. Jacobson