<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BETH R. JACOBSON, | Civil Case No. 09-4329 (FSH) (PS) |
| Plaintiff, | |
| | <u>OPINION</u> |
| v. | |
| CELGENE CORPORATION, | Date: April 14, 2010 |
| Defendant. | |

**HOCHBERG, District Judge:**

**I.      Introduction**

In this action, plaintiff Beth Jacobson (formerly Beth Wolmer) contends that defendant, Celgene Corporation ("Celgene"), misappropriated her idea and was thereby unjustly enriched.[1] In 1998, Ms. Jacobson's husband passed away from multiple myeloma, a cancer of the blood. She alleges that Celgene misappropriated her idea of treating multiple myeloma with the drug thalidomide, which has proven to be an effective medical therapy that in some cases can slow the progression of the disease. Celgene moves to dismiss on two grounds: 1) statute of limitations; and 2) failure to plead sufficiently the elements of misappropriation or unjust enrichment.

**II.     Summary of the Allegations**

The following is a summary of Ms. Jacobson's factual allegations in the amended

---

[1] Ms. Jacobson is an attorney residing in New York. Celgene is a Delaware pharmaceutical corporation with its headquarters in New Jersey.

complaint, which the Court must accept as true for the purposes of this motion.[2]

      A.      <u>Plaintiff's Allegations Regarding the Genesis of the Thalidomide Treatment</u>

Ms. Jacobson's late husband, Dr. Ira Wolmer, was diagnosed with multiple myeloma in March 1995. Multiple myeloma is an invariably fatal cancer of the blood. Upon his diagnosis, he underwent treatment at the Myeloma Institute for Research and Therapy in Little Rock, Arkansas, headed by Dr. Barlogie, a leading researcher of multiple myeloma. In an effort to combat his illness, Dr. Wolmer underwent three bone marrow transplants, but each was unsuccessful in keeping the cancer in remission.

Ms. Jacobson alleges that she put her legal career on hold to aid and support her husband during his illness. She spent significant time researching potential new treatments for multiple myeloma, reviewing numerous scholarly articles on potential cancer therapies that might help Dr. Wolmer, and communicating with the authors of articles that piqued her interest. Ms. Jacobson alleges that, sensitive to her husband's illness and treatment, she requested that the conversation be kept in confidence whenever she spoke to a researcher.

In November 1997, Ms. Jacobson contacted Dr. Judah Folkman in Boston.[3] They discussed Dr. Folkman's research into using thalidomide to treat childhood leukemia. Ms. Jacobson reasoned that therapies for childhood leukemia might also prove effective for multiple myeloma, since both cancers involve a proliferation of white blood cells. Thalidomide stops angiogenesis (new blood vessel formation). Ms. Jacobson alleges that she suggested to Dr.

---

    [2]    At the Court's request, plaintiff's counsel also filed a letter on March 9, 2010, providing greater factual detail on the dates of certain events.

    [3]    Dr. Folkman was a renowned cancer researcher. He passed away in January 2008.

Folkman the possibility of using thalidomide to treat her husband's multiple myeloma, and Dr. Folkman referred Ms. Jacobson to Celgene for this purpose. Celgene held licenses for medically therapeutic uses of thalidomide.

Ms. Jacobson alleges that she and Dr. Wolmer discussed the potential profits from the idea of using thalidomide as a treatment for multiple myeloma. The potential profits were important to them due to the expense of Dr. Wolmer's treatment and because Ms. Jacobson had put her career on hold to support him. In addition, they had a young daughter to support.

The physicians treating Dr. Wolmer were skeptical about Ms. Jacobson's idea for the new treatment, but they agreed to administer it as a last resort, because it was clear that Dr. Wolmer was about to succumb to his illness. Ms. Jacobson, and later Dr. Barlogie, contacted Celgene to obtain thalidomide for Dr. Wolmer's treatment. Ms. Jacobson requested of Celgene that both her an Dr. Barlogie's communications with Celgene be kept confidential. Celgene supplied the thalidomide. In December 1997, Dr. Barlogie requested and was granted clearance from the FDA to administer thalidomide, and the treatment began. Sadly, the treatment was unsuccessful, and Dr. Wolmer passed away in March 1998. However, another patient at the Myeloma Institute asked Ms. Jacobson about the treatment and requested of his treating physicians that he, too, receive thalidomide as a last resort. The treatment was successful. The patient had a near complete remission for a period of time.

Subsequently, Dr. Barlogie and several other researchers, including a Celgene employee, conducted a clinical trial of thalidomide on multiple myeloma patients and published their results in the New England Journal of Medicine. Prior to that time, Ms. Jacobson alleges that no one in the medical field had tried thalidomide as a therapy for multiple myeloma.

3

Following the study, Celgene began to commercialize thalidomide for the treatment of multiple myeloma. In 2006, Celgene received FDA approval to market thalidomide for the treatment of patients with "newly diagnosed multiple myeloma." Its sale of thalidomide and related drugs has resulted in billions of dollars in revenue for the company.

      B.      <u>Plaintiff's Allegations Regarding Subsequent Contact Between Her and Celgene</u>

Ms. Jacobson grieved for her late husband for two years following his death in 1998. In the Fall of 2000, she contacted Celgene's then-CEO, John Jackson. Mr. Jackson expressed gratitude to Ms. Jacobson for her role in initiating the use of thalidomide for treating multiple myeloma. He indicated that he wanted Celgene to maintain a relationship with Ms. Jacobson. Ms. Jacobson inferred from this conversation that Celgene intended to compensate her for the contribution she made to the company. On October 27, 2000, Celgene sponsored a gala for the International Myeloma Foundation ("IMF"), at which Ms. Jacobson received the first ever IMF Courage Award for identifying thalidomide as a treatment for multiple myeloma. In its 2001 annual report, Celgene lauded Ms. Jacobson's work to advance the use of thalidomide to treat multiple myeloma.

Ms. Jacobson and Mr. Jackson continued to speak about the possibility of Ms. Jacobson working with Celgene. In June 2002, Mr. Jackson suggested that Ms. Jacobson could be considered for a seat on the Board of Directors, based on her discovery as well as her qualifications as an attorney. They allegedly discussed the financial rewards of such a position and that it would compensate Ms. Jacobson for her contributions to the company. Mr. Jackson indicated that he would support her nomination, but Ms. Jacobson does not allege that Mr. Jackson promised her a Board seat. They continued to discuss the potential Board seat on a

quarterly basis going forward.  On October 31, 2005, at Mr. Jackson's request, Ms. Jacobson submitted a letter to Celgene's Board of Directors outlining her qualifications for and interest in a seat on the Board.  On December 27, 2005, Celgene announced that Mr. Jackson would retire, effective May 1, 2006, and be succeeded as CEO by Dr. Sol Barer.  Following Mr. Jackson's retirement, discussions between Ms. Jacobson and Dr. Barer continued as before, and in March 2007 Dr. Barer indicated that he would continue his predecessor Mr. Jackson's efforts to have Ms. Jacobson considered for a Board seat.  At Dr. Barer's request, Ms. Jacobson submitted a second letter to Celgene's Board of Directors on July 23, 2007 outlining her qualifications for and interest in a Board seat.  Subsequently, however, Dr. Barer began to cancel every planned meeting or telephone call with Ms. Jacobson.  When Ms. Jacobson did have the opportunity to speak with Dr. Barer, he assured her that her nomination to the Board was being considered.  In February 2009, Dr. Barer's assistant informed Ms. Jacobson via email that Celgene was not interested in a telephone call or a meeting with her.

Ms. Jacobson brought this lawsuit on August 24, 2009.  She asserts two causes of action: misappropriation of an idea and unjust enrichment.  She seeks disgorgement of Celgene's past profits from the sale of thalidomide in the amount of $300 million and payment of 25% of Celgene's future profits from the sale of thalidomide.

### III.    Standard of Review

The standard governing a motion to dismiss is well known.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Phillips v. County of Allegheny*,

515 F.3d 224, 234 (3d Cir. 2008) ("[S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.") (internal quotations omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 129 S. Ct. at 1949 (internal quotations and alterations omitted).

**IV.**     **Discussion**

A party may assert the affirmative defense of the expiration of the statute of limitations when the facts necessary to invoke it appear on the face of the complaint.  *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002).  Both misappropriation of an idea and unjust enrichment sound in quasi-contract.  *See Flemming v. Ronson Corp.*, 258 A.2d 153, 156-57 (N.J. Super. Ct. Law Div. 1969) (misappropriation of an idea); *Callano v. Oakwood Park Homes Corp.*, 219 A.2d 332, 334 (N.J. Super. Ct. App. Div. 1966) (unjust enrichment).  The parties agree that the statute of limitations for both of Ms. Jacobson's claims is six years pursuant to N.J. Stat. Ann. § 2A:14-1, which governs implied contract claims.  Thus, if it appears on the face of the amended complaint that Ms. Jacobson filed suit more than six years from the time her claims accrued, dismissal is proper unless the statute was tolled.

**A.**     **Date of Accrual**

The parties disagree about when Ms. Jacobson's claim accrued.[4]  Celgene dates

---

[4]     The parties agree that the discovery rule does not apply.

the accrual in 1997, when, as alleged, Ms. Jacobson contacted Celgene to obtain thalidomide for the treatment of her late husband's multiple myeloma. Celgene relies on the Third Circuit's decision in *Baer v. Chase*, 392 F.3d 609, 623 (3d Cir. 2004), which, applying New Jersey law, held that a cause of action in quasi-contract began to run when plaintiff last rendered services to defendant. Celgene asserts that Ms. Jacobson last rendered "services" to Celgene when she disclosed her idea about treating multiple myeloma with thalidomide in late 1997. If the cause of action accrued on that date, it expired in late 2003, unless it was tolled.

Ms. Jacobson asserts that the cause of action accrued in February 2009, when Celgene ultimately chose not to offer her a seat on the Board. She relies on *Zic v. Italian Government Travel Office*, 149 F. Supp. 2d 473, 475-76 (N.D. Ill. 2001), a case whose reasoning the *Baer* court adopted. The *Zic* court held that a cause of action for quasi-contract accrues "upon presentment and subsequent rejection of a bill for services, or as soon as the services were rendered." Ms. Jacobson argues that the Third Circuit in *Baer* only utilized the latter test (last rendition of services) because the former (presentment and rejection of a bill) was inapplicable to the facts before it: no bill for services had been presented. Ms. Jacobson asserts that, by contrast, she "presented a bill" for her services when she opened a dialogue with Celgene in 2000 about compensation, and that bill was finally "rejected" by Celgene in February 2009 when Dr. Barer terminated contact with her.

In *Baer*, the Third Circuit expressly adopted the "last rendition of services" test from *Zic*. Even assuming, without deciding, that the Third Circuit might also date the accrual of a cause of action upon the presentment and rejection of a bill, as Ms. Jacobson argues, that test would not apply to this case because Ms. Jacobson does not allege that she ever presented a true

7

"bill" to Celgene for past services or a demand to be paid for them. She alleges instead that she and Celgene discussed a future position on the Board of Directors and the "financial rewards" of such a position. But these "financial rewards" would compensate Ms. Jacobson for services rendered to the company as a member of the Board; she does not allege that Celgene offered her a Board seat as an element of damages to redress its alleged usurpation of her idea. Alleged consideration for a Board seat, without more, does not plausibly suggest that Celgene was responding to a "bill" for services; rather, it is more likely to connote admiration and respect for a patient advocate in a joint battle against a fatal disease or consideration of a person's potential contribution to the future direction of the company. Accordingly, Ms. Jacobson's cause of action against Celgene accrued in November or December 1997, when she last rendered "services" to Celgene. It appears on the face of the amended complaint that the six year statute of limitations thus expired in late 2003, absent tolling.

    B.    <u>Equitable Tolling</u>

It is Ms. Jacobson's burden to plead and prove that she is entitled to equitable tolling. *See Leone v. Aetna Cas. & Sur. Co.,* 599 F.2d 566, 567 (3d Cir. 1979) (explaining that a court entertaining a motion to dismiss on statute of limitations grounds must consider "whether the assertions of the complaint, given the required broad sweep, would permit adduction of proofs that would provide a recognized legal basis for avoiding the statutory bar"); *Green v. Potter*, No. 08-597, 2009 WL 3233492, at *10 (D.N.J. Sept. 28, 2009) ("It is the plaintiff who bears the burden of proving that she is entitled to equitable tolling."). If she were to meet her burden, the inquiry would not end; the Court would weigh any inequity in Celgene's conduct against Ms. Jacobson's long delay in bringing suit and the substantial burden on Celgene to

litigate a claim filed twelve years after it accrued.  *Green*, 2009 WL 3233492, at *10 (recognizing that "it is within the court's discretion to determine whether tolling is appropriate"); *see also W.V. Pangborne & Co., Inc. v. N.J. Dep't of Transp.*, 562 A.2d 222, 232 (N.J. 1989) ("The primary purpose of the statute of limitations is to provide defendants a fair opportunity to defend and to prevent plaintiffs from litigating stale claims.") (internal citations omitted).

        Ms. Jacobson argues that the Court should toll the six-year statute of limitations from the Fall of 2000, when she and Mr. Jackson initiated negotiations about her ongoing relationship with Celgene, until February 2009, when Dr. Barer terminated contact with her.  Under certain circumstances, negotiations between a claimant and a prospective defendant can provide a basis for tolling a statute of limitations.  *See W.V. Pangborne*, 562 A.2d at 228 ("Courts have determined that through the process of negotiating, a defendant can intentionally lull a plaintiff into believing litigation is not necessary; a defendant in those circumstances may not take advantage of the protracted negotiations to have the statute of limitations run against the plaintiff's claim.").  However, mere negotiations, without more, are insufficient to invoke equitable tolling.  Ms. Jacobson must allege and prove that Celgene engaged in inequitable conduct calculated to lull her into forgoing suit within the limitations period in order to be entitled to equitable tolling for the period from 2000 to 2009.  *See id.* at 227 (observing that "equitable estoppel has been used to prevent a defendant from asserting the statute of limitations when the defendant engages in conduct that is calculated to mislead the plaintiff into believing that it is unnecessary to seek civil redress"); *Eagle Fire Prot. Corp. v. First Indemn. of Am. Ins. Co.*, 655 A.2d 939, 946 (N.J. Super. Ct. App. Div. 1995) ("The tolling of a contractual or statutory limitation due to conduct, requires some type of unconscionable conduct on the part of

the [defendant] and not just mere negotiations or discussions."), *rev'd on other grounds*, 678 A.2d 699 (N.J. 1996).

On their face, Ms. Jacobson's allegations describe little more than "mere negotiations or discussions." However, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). It is evident from the amended complaint that Ms. Jacobson's tolling argument rests on her discussions with Mr. Jackson and Dr. Barer regarding the Board seat. Whether those discussions were "calculated to mislead" Ms. Jacobson into forgoing suit is a fact that is more within the control of Celgene than Ms. Jacobson. The policy embodied in the Federal Rules of Civil Procedure favors discovery in learning whether any evidence exists to demonstrate inequitable conduct by Celgene. *See Caldwell Trucking PRP Group v. Spaulding Composites, Co.*, 890 F. Supp. 1247, 1252 (D.N.J. 1995) ("Since the long-established federal policy of civil litigation is to decide cases on the proofs, district courts generally disfavor Rule 12(b)(6) motions.").

Ms. Jacobson should be afforded an opportunity to prove her entitlement to equitable tolling. By the same token, Celgene should be allowed to renew its statute of limitations defense without going through full-blown fact discovery, because a main purpose of the statute of limitations is repose. *United States v. Gen. Electronics, Inc.*, 556 F. Supp. 801, 805 (D.N.J. 1983). Since November or December 1997, when Ms. Jacobson's claim accrued, it is very likely that the memories of potential witnesses have become dim and relevant documents

have been lost or destroyed. *See id.* ("A general purpose of all statutes of limitations is to prevent a claimant from sleeping on his rights and failing to sue an unsuspecting defendant until memories have become dim and evidence lost."). At least one key potential witness, Dr. Folkman, died in 2008 – over ten years after the alleged misappropriation of Ms. Jacobson's idea.

Discovery relating to the statute of limitations issue shall be limited to facts surrounding the conversations with Mr. Jackson and Dr. Barer that allegedly lulled Ms. Jacobson into forgoing suit. Counsel for Ms. Jacobson has represented to Magistrate Judge Shwartz that Plaintiff intends to prove that Celgene lulled her into forgoing suit mostly through deposition testimony. Ms. Jacobson may take the depositions of Mr. Jackson and Dr. Barer within sixty days of the entry of this opinion.[5] Within the same sixty day period, Celgene may depose Ms. Jacobson. Each party shall be entitled to ten *duces tecum* requests per deposition. Within ninety days, Celgene may renew its statute of limitations defense by motion for summary judgment.

**V.     Conclusion**

For the reasons set forth in this opinion, Celgene's challenge to the pleadings on

---

[5]     Counsel for Ms. Jacobson has also represented to the Magistrate Judge that he would like to take the deposition of every member of Celgene's Board from 2000 to 2009. Celgene's public filings reveal that both Mr. Jackson and Dr. Barer also served as Chairman of the Board while CEO of the Company. It is unlikely that deposing the other members of the Board for this period would reveal any additional relevant information. In addition, Ms. Jacobson's pleadings suggest that Mr. Jackson, at least, was sympathetic to her and is no longer affiliated with Celgene. There is no apparent reason to believe that he would shade the truth about their discussions and her alleged candidacy for the Board. Ms. Jacobson's need to take these additional depositions is also outweighed by the associated burden and expense on Celgene, which has been aggravated by Ms. Jacobson's delay in bringing suit.

statute of limitations grounds is denied, to be renewed on summary judgment.[6] An appropriate order will issue.

       /s/  Faith S. Hochberg
      Hon. Faith S. Hochberg, U.S.D.J.

---

[6] Celgene also contends that Ms. Jacobson did not allege sufficiently the elements of unjust enrichment and misappropriation of an idea. Specifically, it argues that she failed to allege that she expected to be remunerated at the time she rendered her services to Celgene (unjust enrichment) and that she kept her idea confidential (misappropriation). These challenges to the sufficiency of the pleadings do not justify dismissal at this stage.

Nevertheless, the Court notes the unprecedented theory of Ms. Jacobson's case, to wit, that one can "own" the right to a medical therapy outside the context of patent law or other established forms of intellectual property. To so hold would be a significant expansion of the misappropriation concept beyond the extent to which it has heretofore been applied. In addition, counsel for Celgene has represented to the Court that the thalidomide treatment is patented. The discovery process would, among other things, create a full factual record of the current intellectual property rights as to the thalidomide treatment. Celgene may renew its factual and legal challenges to the substance of Ms. Jacobson's claims at the close of discovery in a motion for summary judgment.